**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| WANDA THURMAN, ) | |
| ) | CASE NO. 1:12-cv-2034 |
| Plaintiff, ) | |
| ) | |
| v. ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | **MEMORANDUM OPINION & ORDER** |
| ) | |
| Defendant. ) | |

Plaintiff Wanda Thurman ("Thurman") challenges the final decision of the Commissioner of Social Security ("Commissioner"), denying Thurman's claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is AFFIRMED.

**I. Procedural History**

On May 4, 2009, Thurman filed an application for SSI alleging a disability onset date of February 14, 2009.  (Tr. 13.)  Her application was denied both initially and upon reconsideration. Thurman timely requested an administrative hearing.

On January 13, 2011, an Administrative Law Judge ("ALJ") held a hearing during which Thurman, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 13.) On February 17, 2011, the ALJ found Thurman was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. (Tr. 21.) The ALJ's decision became final when the Appeals Council denied further review.

## II. Evidence

*Personal and Vocational Evidence*

Age forty-eight (48) at the time of her administrative hearing, Thurman is a "younger" person under social security regulations. *See* 20 C.F.R. § 416.963(c). (Tr. 21.) Thurman has at least a high school education and no past relevant work. *Id*.

*Hearing Testimony*

At the hearing, Thurman testified as follows:

- She has a bachelor's degree in sociology and criminology. She never had a job utilizing her degree. (Tr. 34-35.)

- She worked as a full-time parking attendant for two weeks until her father became ill. (Tr. 34-35.)

- In 2000, she worked full-time as a bank teller for one month, but stopped when her mother became ill. (Tr. 36.)

- She cannot work due to constant burning in her whole body. (Tr. 36.) Her feet feel as if "somebody's sticking pins in them." (Tr. 36-37.) She takes "twenty pills a day," but they do not help. (Tr. 37.) Hot showers help temporarily alleviate her pain. (Tr. 37.)

- She has difficulty standing and walking. (Tr. 37-38.)

- She does not sleep well at night. (Tr. 38-39.)

- She washes dishes, but started dropping things two months ago. (Tr. 39-40.)

- She began staying with her companion two months earlier because using the stairs at her apartment came to be "too much." (Tr. 39.)

- In the past two months since she moved in with her companion, she does not cook, vacuum, or do laundry. Prior to that, it would take her twice as long to perform chores than in the past. (Tr. 40.)

- It takes her an hour and a half to get dressed in the morning. (Tr. 42.)

- Her medication causes sleeplessness, and she has had thoughts of suicide. (Tr. 43.) Her medication also causes drowsiness and she sleeps during the day in three to four hour increments. (Tr. 44.)

- She uses a cane to help her walk. It was prescribed for her in 2009. (Tr. 45.) Prior to that, she used to fall two to three times per week. (Tr. 46.)

- On a scale of one to ten with ten being the worst, she rates her average pain as 9 to 9.5, sometimes 10. (Tr. 46.)

- She has constant gout flare ups, but cannot differentiate the pain associated with that from the pain associated with fibromyalgia. (Tr. 48.)

- Dr. Ibrahim is her primary care physician, who treats her hypertension and gout. (Tr. 48-49.)

The ALJ posed the following hypothetical to the VE:

Assume that we have an individual that was 45 at onset, is currently 47 and has ... a four year degree in sociology and criminology.... And no past relevant work experience.... Assume that this individual ... is limited to sedentary work, can lift and carry no more than 10 pounds occasionally, can stand and walk no more than two out of eight hours and sit for at least six out of eight hours, that she should not operate foot controls with her lower extremities, that she can perform the postural activities occasionally but never climb ladders, ropes or scaffolds. She can only occasionally reach overhead and she should avoid concentrated exposure to work hazards.

(Tr. 49-50.) The VE testified that such an individual could perform the following unskilled work: general office clerk (2,100 jobs locally, 10,000 statewide, 207,000 nationally); order clerk (1,800 jobs locally, 9,000 statewide, 200,000 nationally); and, table worker (5,000 jobs locally, 27,000 statewide, 473,000 nationally). (Tr. 50.) The VE further testified that the need to use a

3

cane to ambulate would not substantially affect these jobs, as they are performed at the sedentary level. *Id*. If Thurman's testimony as to her limitations were credited, the VE noted that no employment would be available. (Tr. 51.)

### III. Standard for Disability

A disabled claimant may be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV. Summary of Commissioner's Decision

The ALJ found Thurman established medically determinable, severe impairments, due to

"hypertension; right knee pain with a patellofemoral syndrome and possible strain or ACL tear; degenerative joint disease of the low back; gout; fibromyalgia; obesity; restless leg syndrome; and PES tendonitis." (Tr. 15.) However, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thurman was determined to have a Residual Functional Capacity ("RFC") for a limited range of sedentary work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Thurman was not disabled.

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also

5

support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. Analysis

*Treating Physician*

Thurman asserts that the ALJ erred by rejecting the opinions of Ahmed Ibrahim, whom she claims was her treating primary care physician.[1] (ECF No. 14 at 9.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006); 20 C.F.R. § 404.1527(c)(2). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[2]

---

[1] Pursuant to a query at https://license.ohio.gov/lookup/default.asp, Dr. Ahmed Mohsen Ibrahim's license type did not become "Doctor of Medicine" until March 16, 2012 – well after the relevant treatment and medical source statement were completed. As such, on May 9, 2013, the Court held oral arguments to address the issue of whether Dr. Ibrahim was a licensed and treating physician during the relevant time frame. (ECF Nos. 16, 18.) The parties both filed supplemental briefs. (ECF Nos. 19 & 21.)

[2] Pursuant to 20 C.F.R. §§ 404.1527(c) & 416.927(c), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p).

On May 20, 2010, Dr. Ibrahim completed a medical source statement concerning Thurman's physical capacity. (Tr. 390-91.) Except for the boxes checked, the statement is largely illegible. *Id*. Dr. Ibrahim opined that during an eight-hour work day, Thurman could stand/walk for zero hours. (Tr. 390.) He also opined that sitting was affected, but did not specify how many hours Thurman could sit during an eight-hour day. *Id*. A sit/stand option, however, was found to be necessary. (Tr. 391.) Lifting/carrying was also affected, though the weight limitations are also illegible. (Tr. 390.) He found that postural activities could rarely/never be performed, nor could Thurman feel or perform fine or gross manipulation. (Tr. 390-91.) Dr. Ibrahim also opined that Thurman would need additional breaks. (Tr. 391.)

The ALJ addressed Dr. Ibrahim's opinion as follows:

> The undersigned gives little weight to the opinions offered by Dr. Ibrahim (Exhibit 14F and 16F). The limitations he put forward are inconsistent with his own treatment records (Exhibits 1F, 6F, 12F, 19F, and 21F). For example, his most recent treatment records indicate that the claimant's hypertension is controlled and that her extremities are normal (Exhibit 21F, p. 4). These findings

---

record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

> are inconsistent with his May of 2010 opinion that the claimant can rarely/never perform postural activities and cannot stand or walk at all during the day due to right lower extremity pain (Exhibit 14F). Moreover, his opinions are inconsistent with the opinions offered by Dr. Thompson and the State Agency medical consultants, all of which the undersigned affords greater weight. As such, the undersigned gives little weight to the opinions offered by Dr. Ibrahim.[3]

(Tr. 21.)

Pursuant to 20 C.F.R. § 416.913, sources are divided into two broad categories – "acceptable medical sources" and "other sources." The regulations set forth five categories of "acceptable medical sources," defined as follows:

> (1) Licensed physicians (medical or osteopathic doctors);
>
> (2) Licensed or certified psychologists. Included are school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting, for purposes of establishing mental retardation, learning disabilities, and borderline intellectual functioning only;
>
> (3) Licensed optometrists, for purposes of establishing visual disorders only (except, in the U.S. Virgin Islands, licensed optometrists, for the measurement of visual acuity and visual fields only). (See paragraph (f) of this section for the evidence needed for statutory blindness);
>
> (4) Licensed podiatrists, for purposes of establishing impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or the foot and ankle; and
>
> (5) Qualified speech-language pathologists, for purposes of establishing speech or language impairments only. For this source, "qualified" means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence from the American-Speech-Language-Hearing Association.

---

[3] It bears noting that the ALJ did not characterize Dr. Ibrahim as a "treating source." By comparison, the ALJ specifically identified Dr. Thomsen as a "treating source." (Tr. 21.)

9

20 C.F.R. § 416.913(a).

By contrast, the other broad category conveniently named "other sources" includes social welfare agency personnel, educational personnel, non-medical sources (*e.g.* family, friends, etc.), as well as "medical sources" that did not meet the definition of an "acceptable medical source" as defined above. 20 C.F.R. § 416.913(d). For the sake of expediency, this other category of "medical sources" that falls under the broader category of "other sources" will be referred to as "other" medical sources in the remainder of this opinion.

Thurman asserts that Dr. Ibrahim was a treating physician or an acceptable medical source. (ECF No. 19 at 4.) As explained below, however, only acceptable medical sources can be considered treating sources. Thus, in the case at bar, the key question is whether Dr. Ibrahim qualifies as an "acceptable medical source" or is merely an "other" medical source.

Thurman argues that Dr. Ibrahim is a physician because the American Medical Association Code of Medical Ethics indicates that "[r]esidents and fellows have dual roles as trainees and caregivers. First and foremost, they are physicians and therefore should always regard the interests of patients as paramount."[4] (ECF No. 19 at 5.) Thurman also asserts in *Abbott v. Astrue*, 4:10-CV-2253, 2012 WL 761587 (D.S.C. Mar. 8, 2012), a district court construed the opinion of a neurological resident, Dr. Grier, as that of a treating physician. *Id*. The authorities cited by Thurman, however, are not directly on point. First, in *Abbott*, there is no clear indication that the physician in question, Dr. Grier, was only a resident, as the only pertinent information on this topic was contained in a footnote: "Dr. Grier asserted that she took

---

[4] Thurman's brief quotes the AMA Code of Medical Ethics at Opinion 8.088. (ECF No. 19 at 5.) *See* http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion8088.page?

10

over the care of Plaintiff in the MUSC Neurology Resident's Clinic in the beginning of 2004." 2012 WL 761587 at n. 2. Even assuming that Dr. Grier was a resident, there is no indication that she was not *licensed* to practice medicine in the state of South Carolina. Similarly, the AMA Code of Medical Ethics simply states that residents are physicians. However, in order to be considered an "acceptable medical source," Dr. Ibrahim must have been a *licensed* physician.[5]

At the time Dr. Ibrahim rendered his opinion and "treatment," he had an "MD Training Certificate" from the State Medical Board of Ohio. As pointed out in the Commissioner's brief, the Medical Board allows an individual in the medical field to apply for a training certificate or for a license.[6] (ECF No. 21 at 2.) The application for a training certificate, which Dr. Ibrahim possessed, expressly states:

> **Limitations on your practice** – Your acknowledgment letter and the training certificate you subsequently receive allow you to perform such acts as may be prescribed by or incidental to your internship, residency, or clinical fellowship program. However, you are not entitled to otherwise engage in the practice of medicine and surgery or osteopathic medicine and surgery in this state.
>
> You must limit activities under the acknowledgment letter and training certificate to the programs of the hospitals or facilities for which the training certificate is issued. You may train only under the supervision of the physicians responsible for supervision as part of the training program.

*See* http://www.med.ohio.gov/pdf/Applications/trainreg.pdf (Emphasis in original).

On the three occasions that Dr. Ibrahim apparently treated Thurman – on August 12, 2009, February 10, 2010, and April 14, 2010 – the signature of supervising physician, Meyya

---

[5] It bears noting that the AMA is *not* the body that licenses physicians to practice medicine in Ohio.

[6] The Ohio medical Board's website contains separate links to applications for training certificates and to applications for medical or osteopathic medicine certificates. *See* http://www.med.ohio.gov/practitioner.htm

11

Somasundaram, M.D., also appears on the treatment notes. (Tr. 351, 379, 382.) Dr. Ibrahim was not authorized to practice medicine except under Dr. Somasundaram's supervision.[7] Based on the foregoing, the Court finds that while Dr. Ibrahim had a training certificate, he was not a "licensed physician" under the regulations. As such, Dr. Ibrahim could only be designated as an "other" medical source.

The distinction between "acceptable medical sources" and "other" medical sources is not merely semantics. Because Dr. Ibrahim does not meet the definition of an "acceptable medical source," he also cannot be considered a "treating" physician. The self-stated purpose of Social Security Ruling ("SSR") 06-03p (Aug. 9, 2006) was "[t]o clarify how we consider opinions from sources who are not 'acceptable medical sources'..." SSR 06-03p acknowledges that the term "medical sources" refers to both "acceptable medical sources" and other health care providers who in this recommendation are being called "other" medical sources. However, the ruling expressly states that "**only "acceptable medical sources" can be considered treating sources**, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight. See 20 CFR 404.1527(d) and 416.927(d)." SSR 06-03p (emphasis added). It necessarily follows that the ALJ was not required to give any special deference to the opinion of Dr. Ibrahim. Furthermore, the ALJ was not required to give "good reasons" in her decision for the weight she ascribed to Dr. Ibrahim, as that requirement only applies to the opinions of *treating* sources. *See* 20 C.F.R. § 416.927(c)(2); *Hickox v. Comm'r of Soc. Sec.*, 2010 WL

---

[7] The information provided for applicants for an actual medical license warns that "OHIO LAW DOES NOT PROVIDE FOR TEMPORARY OR PROVISIONAL LICENSURE WHILE YOUR REQUEST FOR LICENSURE IS BEING PROCESSED. **PRACTICE PRIOR TO LICENSURE CONSTITUTES THE ILLEGAL PRACTICE OF MEDICINE**." *See* http://www.med.ohio.gov/pdf/Applications/geninfo.pdf

3385528 (W.D. Mich. Aug. 2, 2010) report and recommendation adopted, 2011 WL 6000829 at *6 (W.D. Mich. Nov. 30, 2011) ("[The] opinions [of other sources] are not entitled to deference under the treating physician rule ...")

As explained by the *Hickox* court, because the opinion of a social worker fell within the category of "other sources," the regulations merely require that the information be "considered." *Hickox*, 2010 WL 3385528 at **6-7. That court concluded that the consideration level "is not a demanding standard." *Id*. In the case at bar, the ALJ plainly did not ignore the opinion of Dr. Ibrahim, as it was expressly addressed in the decision. (Tr. 21.) Therefore, the "consideration" requirement was satisfied. Pursuant to SSR 06-03p, "there is a distinction between what an adjudicator must *consider* and what the adjudicator must *explain* in the disability determination or decision..." While SSR 06-03p does state that "the adjudicator generally should explain the weight given to opinions from these 'other sources,'" courts have found that this ruling does not *require* any explanation, let alone a heightened level of explanation as required with treating sources. *See, e.g., Hickox*, 2010 WL 3385528 at *7; *Smith v. Comm'r of Soc. Sec.*, 2010 U.S. Dist. LEXIS 39785, 8-9 (E.D. Va. Apr. 22, 2010) ("while an ALJ is required to consider all of the relevant evidence in the record, there is no requirement that the ALJ expressly discuss each piece of that evidence.... Indeed, such a requirement, if it existed, would impose an insuperable burden on the adjudicatory system of the Social Security Administration. The mere fact that the ALJ did not discuss one, several, or even many treatment records cannot therefore justify the conclusion that the ALJ did not consider those records."); *James v. Astrue*, 2012 U.S. Dist. LEXIS 50064 at **39-40 (M.D. Tenn. Mar. 21, 2012) ("The Court agrees with the distinction made in *Hickox* that the word 'should' does not create a mandatory duty with which the ALJ

13

must comply.")

Here, the ALJ went beyond the consideration requirement and spent a full paragraph *explaining* why Dr. Ibrahim's opinion was afforded little weight. (Tr. 21.) Therefore, the ALJ carried out her duty to consider and/or explain the evidence from an "other source," and Thurman's first assignment of error is without merit.

*Manipulative Restrictions*

Thurman also argues that the ALJ's RFC finding is not supported by substantial evidence, because it omits necessary manipulative restrictions. (ECF No. 14 at 10-11.)

The RFC determination sets out an individual's work-related abilities despite their limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence. *See* 20 C.F.R. § 416.946(c). "Judicial review of the Commissioner's final administrative decision does not encompass re-weighing the evidence." *Carter v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 40828 at **21-22 (W.D. Mich. Mar. 26, 2012) (*citing Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472 (6th Cir. 1982); *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011); *Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 807 (6th Cir. 2008)).

Thurman asserts that the following evidence supports the need for inclusion of manipulative restrictions. (ECF No. 19.) On April 22, 2009, she complained of pain in her wrist. (Tr. 343.) On May 7, 2009, she was seen at a Physical Therapy clinic to receive a splint

14

for her right wrist. (Tr. 294.) Thurman stated that the pain, which she rated as nine out of ten, began approximately two weeks earlier. *Id*. The occupational therapist noted mild swelling in the right wrist and limited right forearm rotation. (Tr. 294-95.) On September 24, 2009, Philip Stickney, M.D., noted that Thurman complained of knee pain and stiffness in her hands. (Tr. 366.) He noted that "[h]er clinical picture does not fit the laboratory and radiographic evaluation." *Id*. Thurman also made complaints of generalized joint pain to rheumatologist Kimberly Thomsen on December 1, 2009. (Tr. 360.) However, Dr. Thomsen's musculoskeletal examination revealed "0 signs of arthritis, 0 swelling, 0 redness, 0 signs of synovitis, [and] 0 localized tenderness." *Id*. Thurman again complained to Dr. Stickney of hand stiffness, among other symptoms, on December 17, 2009. (Tr. 365.) He did not reference that complaint in his assessment. *Id*. On May 25, 2010, Thurman complained of worsening, diffuse pain but had zero synovitis. (Tr. 392.) Dr. Thomsen ordered a neurological referral. *Id*. On August 25, 2010, Thurman was seen by Dr. Robert Richardson who reported no clear neurological findings and ruled out neuropathy. (Tr. 402.) Dr. Thomsen's notes from September and December of 2010 are difficult to read but appear to indicate some tenderness in her upper extremities. (Tr. 410, 416.)

First, it must be noted that the ALJ did include a restriction in the RFC that limited Thurman to only occasional overhead reaching. (Tr. 16.) The above evidence contains minimal objective medical findings. The majority of the evidence consists of subjective complaints of hand pain or stiffness. The ALJ found that Thurman's symptoms were not credible to the extent they were inconsistent with the RFC. (Tr. 17.) Thurman, however, has not challenged the ALJ's credibility determination. Given Thurman's failure to cite a single medical source indicating any

manipulative restrictions were warranted, the Court cannot find that the RFC determination was in error. In addition, it would be inappropriate for this Court to re-weigh the evidence. Therefore, Thurman's second assignment of error is without merit.

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is AFFIRMED and judgment is entered in favor of the defendant.

IT IS SO ORDERED.

/s/ Greg White
U.S. Magistrate Judge

Date: May 29, 2013